**SO ORDERED.**

**SIGNED this 30 day of May, 2013.**

_____
**Stephani W. Humrickhouse
United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

| | |
|---|---|
| IN RE: | CASE NO. |
| REX ALLEN OSBORNE<br>CHRISTINE L. OSBORNE | 12-00230-8-SWH |
| DEBTORS | |

### ORDER REGARDING CONFIRMATION

The matter before the court is confirmation of the debtors' chapter 11 plan of reorganization and the bankruptcy administrator's objection thereto. A hearing took place in Raleigh, North Carolina on April 9, 2013. The parties filed briefs on April 18, 2013, and April 19, 2013. For the reasons that follow, confirmation will be denied.

Rex Allen Osborne and Christine L. Osborne filed a petition for relief under chapter 13 of the Bankruptcy Code on January 11, 2012, however, the case was converted to chapter 11 on

October 18, 2012.[1]  The debtors filed their chapter 11 plan of reorganization on January 16, 2013.

The plan provides as follows, in pertinent part:

- Priority Tax Debt: The debtors owe priority IRS debt in the amount of $110,484.55 and priority taxes to the NC Department of Revenue in the amount of $1,569.00. All priority tax claims shall be paid in full by January 2017.[2]

- Class I: First Deed of Trust secured by 3801 Westbury Lake Drive, Raleigh NC: Debtors propose to impair the first position secured claim of Bank of America by re-amortizing the loan balance and all pre-petition costs, penalties and arrears at an interest rate of 5.75% for 30 years, concluding on April 1, 2043. The value of the property is $575,000. The loan of Bank of America will be considered fully secured. The second place loan of E-Trade Bank is fully unsecured and is treated in Class V.

- Class II: Deed of Trust secured by 7 Laurel Cherry Court, Bald Head Island NC: Debtors propose to impair the secured claim of HSBC Bank[3] by re-amortizing the secured portion of the loan balance and all pre-petition arrears and costs at the variable interest rate of 3.0% . . . for thirty years, concluding on April 1, 2043. The loan shall be secured in the amount of $429,000. The remaining unsecured portion of $36,408.14 shall be treated as general unsecured claim in Class V.

- Class III: Loan Secured by 2010 Lexus RX350: Debtors propose to leave their car loan unimpaired and for normal payments and billing statements to resume.

- Class IV: Federal Taxes Secured by All Assets of the Debtors as of Petition Date of January 11,2012: Debtors propose to leave the secured claim of the Internal Revenue Service unimpaired. On the petition date, the debtors owned assets totaling $30,785.38 [$14,053.64 in cash or bank account balances, $9,200 in household goods, and equity of $7,531.74 in vehicles and golf carts]. The debtors' real property is over-encumbered by deeds of trust that

---

[1] The conversion occurred pursuant to a consent order dated August 28, 2012, which resolved (1) the trustee's motion to dismiss the case for failure to file and provide certain tax returns, as well as feasibility issues; and (2) the Internal Revenue Service's motion to dismiss on the grounds that the debtor was ineligible to file under chapter 13 because they had unsecured debt in excess of the 11 U.S.C. § 109(e) limit.

[2] According to the debtors' disclosure statement, these claims are to be paid in equal monthly installments, via monthly payments of $2,401.83 to the IRS and $34.10 to the NCDOR.

[3] Based on the claim and representations by counsel for the debtors, this claim was filed by HSBC, with America's Servicing Company as the designee for receipt of notices, however Wells Fargo is now the holder of the note.

pre-date the federal tax lien and provide no value to which the IRS lien can attach. The IRS claim filed on October 25, 2012 identifies its secured claim as totaling $118,450.00. The debtor's schedules indicate unencumbered assets of $30,785.38. Should the IRS fail to amend their proof of claim, the debtor will object. Whatever the final determination of the secured tax amount, the debtors propose to pay it in full, at an interest rate of 4.0%, by January 1, 2017.

- <u>Class V: General Unsecured Claims</u>: Debtors propose to impair general unsecured debt. The liquidation analysis shows unencumbered, non-exempt assets on January 16, 2013 totaling $125,956.35. In a hypothetical chapter 7 case, $112,053.55 would be paid to priority tax debt, leaving $13,902.80 to be paid to general unsecured creditors. Class V will share a distribution in excess of that amount: $20,000.00. This money will be divided on a pro rata basis and paid in quarterly installments of $1,333.33 ($333.33 per month) until April 1, 2018.

Debtors' Plan of Reorganization, Docket No. 85.

Subsequently, objections to confirmation of the plan were filed by the IRS, Bank of America, America's Servicing Company and the bankruptcy administrator. At the time of the hearing, counsel for the debtors reported resolutions with all objecting creditors,[4] leaving only the objection of the

---

[4] The resolved objections are reflected in the debtors' "Final Plan of Reorganization As Amended By Agreement," which has not been filed, but is attached to their Memorandum in Support of Plan of Reorganization," filed on April 18, 2013, and includes the following revisions to the original plan:
- <u>Priority Tax Debt</u>: The IRS claim of $110,484.55 and the NCDOR claim of $1,569.00 will each be paid in full at 4% in 53 equal installments of $2,277.64 and $32.34, respectively.
- <u>Class 1</u>: Bank of America's claim of $639,300.99 will be paid at original contract terms, including a $3,841.72 monthly payment. Arrears, fees, and expenses will be paid in full within 60 months at $1,061 per month.
- <u>Class 2</u>: Wells Fargo's loan shall be secured in the amount of $468,744.34, and paid at 5.25%; monthly payment of $2,589 for 30 years.
- <u>Class 3</u>: The interest rate on the loan secured by the 2010 Lexus RX350 (claim amount: $36,518.26) will be reduced to 5.25%; monthly payments of $694 through December 2017.
- <u>Class 4</u>: Based on their scheduled unencumbered asset value of $30,785.38, the debtors propose to pay this amount to the IRS at 3%, in monthly payments of $554 for 60 months.
- <u>Class 5</u>: The amended plan refers to a pending motion to value collateral as to the E*Trade second deed of trust on the Raleigh property. The motion has since been heard and an order was entered on May 7, 2013, which provides that "the loan held or serviced by E*Trade Bank secured by a second deed of trust is an unsecured claim and should be so treated in the debtors' chapter 11 plan." Order Granting Motion to Value Collateral, Docket No. 119.

bankruptcy administrator. With regard to balloting, the IRS voted to accept the plan treatment of its priority claim as amended by agreement, but did not ballot as to claims in other classes. Bank of America did not submit a ballot. Counsel for the debtors indicated at the hearing that Wells Fargo, the new holder of HSBC/America's Servicing Company loan, accepted the plan treatment subject to a modification agreement, however no ballot was submitted. Finally, the debtors received accepting ballots from two of their unsecured creditors, American Express Centurion Bank and Verizon Wireless, and no rejecting ballots.

The male debtor in this case is a real estate broker, and the debtors propose to fund plan payments and distributions from his commission-based income. The female debtor does not have paid employment, but assists the male debtor with his paperwork, and plans to obtain a license to sell real estate. The debtors' 12-year-old son attends private school in Raleigh. Their 19-year-old son is taking two courses at a local college, and is currently seeking employment. The debtors own the following vehicles: a 2010 Lexus RX350, a 2003 Mercury Mountaineer, and two golf carts kept at their vacation home. The debtors and their sons live in a 4,200 square foot home in Raleigh, North Carolina (the "Raleigh Property"), with a scheduled value of $575,000; the tax value is $667,382.00.[5] In addition to the Raleigh Property, the debtors have a second home in Bald Head Island, North Carolina (the "Bald Head Island Property"). The male debtor testified that the Bald Head Island Property was recently appraised by a mortgage company at a value of approximately $450,000. The debtors have recently begun to rent out the Bald Head Island Property, however they state that it is largely a seasonal endeavor. By renting the home out during the 10-week summer

---

[5] According to the Bankruptcy Administrator's Brief in Support of Objection to Confirmation of Plan, pg. 3, Doc. No. 112.

rental season, at $1,800 per week, plus a few extra rentals during the year, the debtors anticipate generating income of $1,583 per month on average over the course of a year.

The male debtor's income fluctuates greatly given the nature of the real estate business and his commission-only pay structure. Prior to the decline in the economy that began in 2008, his salary averaged between $200,000 and $300,000 per year. His income suffered with the economic decline, and additionally in 2010, upon being diagnosed with a significant illness. In the past year or so, however, he has experienced renewed health and is working 50-60 hours per week. In fact, for 2012, the male debtor grossed approximately $314,000. Going forward, his best estimate of expected business income is $20,000 per month. Along with the anticipated rental income from the Bald Head Island Property at $1,583 per month, the debtors project total income of $21,583 per month during the course of their five-year plan. At the time of the hearing, the debtors had roughly $140,000 on hand in their bank accounts. The male debtor testified that this money will be set aside for use in the event his income is insufficient to make the plan payments in any given month.

Although the debtors project significant income after confirmation, they will incur equally significant monthly expenses and costs of living. The following is gleaned from the budget submitted during the confirmation hearing:

| **Expenses Associated with the Raleigh Property** | |
|---|---|
| Mortgage | $3,841.72 |
| Property taxes | $344.00 |
| Homeowner's insurance | $66.00 |
| HOA dues | $43.30 |
| Utilities and heating | $300.00 |
| Water and sewer | $75.00 |

| | |
|---|---|
| Cable/internet | $80.00 |
| Home maintenance and repair | $100.00 |
| | |
| **Transportation** | |
| Car payment: Lexus | $694.00 |
| Auto insurance | $222.00 |
| Gasoline, car repairs, oil changes | $400.00 |
| | |
| **Household Expenses** | |
| Telephone | $220.00 |
| Food | $700.00 |
| Clothing | $100.00 |
| Laundry and dry cleaning | $100.00 |
| Medical and dental expenses | $200.00 |
| Recreation and entertainment | $100.00 |
| | |
| **Expenses associated with the Bald Head Island Property** | |
| Mortgage (Bald Head Island Property) | $2,513.00 |
| Property taxes | $455.00 |
| Property insurance | $458.00 |
| Homeowners insurance | $25.00 |
| HOA dues | $21.00 |
| Maintenance and repairs | $166.00 |
| Shoals club membership | $120.00 |
| | |
| **Other expenses** | |

| | |
|---|---|
| Private school tuition | $1,450.00 |
| Life insurance | $83.00 |
| Health insurance (projected) | $700.00 |
| Ongoing estimated income taxes | $3,000.00 |
| Retirement contribution | $500.00 |

In addition to these expenses, under their plan the debtors will pay $2,310/month toward priority taxes, $1,060.53/month toward arrears on the Raleigh Property, $554/month toward secured tax obligations, and $334/month to unsecured creditors, bringing their total projected expenses and plan payments to $21,335.55, and resulting in a monthly net income of $247.45.

The bankruptcy administrator objects to confirmation of the debtors' plan, asserting that it is not proposed in good faith as required by 11 U.S.C. § 1129(a)(3), for two primary reasons: (1) the debtors' proposed repayment to unsecured creditors is inadequate, given their substantial cash reserves and general standard of living, and (2) many of the debtors' expenses are excessive and unnecessary. The debtors contend that (1) no unsecured creditor objected to the plan, rendering the disposable income test of § 1129(a)(15) inapplicable, (2) the good faith test of § 1129(a)(3) is a less stringent standard than that of § 1129(a)(15), and (3) the debtors' lifestyle and expenses are consistent with the objectives and purposes of the Bankruptcy Code.

Section 1129(a) sets out the requirements for confirmation of a chapter 11 plan, including the general rule under subsection (a)(8) that all impaired classes must accept the plan. In this case, the debtors did not receive affirmative acceptances from every impaired class. A plan can be confirmed notwithstanding the failure to satisfy § 1129(a)(8), so long as the plan does not

7

discriminate unfairly and is fair and equitable to the classes not accepting the plan. See 11 U.S.C. § 1129(b)(1); In re Bryson Properties, XVIII, 961 F.2d 496, 500 (4th Cir. 1992).

Before proceeding to a cram down analysis, however, the debtors must establish their compliance with every requirement under § 1129(a) other than § 1129(a)(8). If those requirements are not satisfied, there is no cram down analysis and the plan cannot be confirmed. The court's focus will be on whether the debtors have satisfied the good faith requirement of § 1129(a)(3).

Section 1129 provides that "[t]he court shall confirm a plan only if . . . [t]he plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). Although the term "good faith" is not defined by the Code, courts have generally interpreted it to mean there is a "'reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'" In re Madison Hotel Assocs., 749 F.2d 410, 425 (7th Cir. 1984) (quoting In re Nite Lite Inns, 17 Bankr. 367, 370 (Bankr. S.D. Cal. 1982). When conducting a good faith inquiry, a court must view the plan in light of the totality of the circumstances surrounding the proposal of the plan. In re Piece Goods Shop Co., 188 B.R. 778, 790 (Bankr. M.D.N.C. 1995). The burden is on the plan proponent to establish that the requirements for confirmation under §1129(a), including good faith, have been satisfied. In re Swartville, LLC, 2012 Bankr. LEXIS 3809, 56 Bankr. Ct. Dec. 248 (Bankr. E.D.N.C. Aug. 17, 2012).

The court will first examine the bankruptcy administrator's contention that the debtors' proposed distribution of $20,000 to unsecured creditors is inadequate in light of their current standard of living, and therefore the plan does not satisfy the good faith requirement of § 1129(a)(3). The debtors project approximately $20,000 per month in income, and in recent months have averaged approximately $30,000 in income, yet they only propose to pay $334 per month toward

8

their unsecured debt. The debtors contend that their proposed distribution of $20,000 to unsecured creditors is adequate because the disposable income test of § 1129(a)(15) does not apply, and therefore the debtors are not required to pledge more. Section 1129(a)(15) requires, upon the objection of an unsecured creditor, that the plan provide either for payment of such creditor in full or the commitment of the debtor's projected disposable income to the plan for at least five years. Here, because no unsecured creditor objects to confirmation, this test does not apply. The debtors further contend that the good faith standard of § 1129(a)(3) requires less of a debtor than the disposable income test of § 1129(a)(15), reasoning that to construe the good faith standard as equally or more stringent than the disposable income test would render § 1129(a)(15) superfluous. Yet no case law is offered in support of this argument. The court views the good faith standard not as more or less stringent than the disposable income test, but rather, as a different standard. The disposable income test only comes into play when an unsecured creditor that is not to be paid in full objects to confirmation. The good faith requirement, on the other hand, applies to every case and encompasses the totality of the circumstances surrounding confirmation of a debtor's plan of reorganization. See In re Stigliano, Jr., 483 B.R. 303, 305 (Bankr. W.D. Pa. 2012) (finding that the § 1129(a)(3) good faith requirement applies regardless of whether the § 1129(a)(15) requirement applies to a particular case).

Thus, in considering the adequacy of the proposed distribution to unsecured creditors under the debtors' plan, the court notes that one of the circumstances courts have consistently considered when conducting a good faith inquiry is a debtor's ability to repay creditors. See, e.g., In re Fernandez, 97 B.R. 262, 263 (Bankr. E.D.N.C. 1989) (noting that in individual chapter 11 cases, just as in chapter 13 cases, a debtor's ability to pay is certainly a factor the court considers when

determining whether a plan has been proposed in good faith); In re Harman, 141 B.R. 878, 889 (Bankr. E.D. Pa. 1992) ("[A] debtor's failure to make anything close to the best offer of payment to the creditors violates both 11 U.S.C. § 1129(a)(3) and (b)(1)."); Crestar Bank v. Walker (In re Walker), 165 B.R. 994, 1001 (E.D. Va. 1994) (finding that the failure of a debtor to use the full reach of available resources to repay creditors is evidence of bad faith because such conduct frustrates a primary objective of the Bankruptcy Code, which is the prompt repayment of creditors); In re Weber, 209 B.R. 793, 798-99 (Bankr. D. Mass. 1997) ("In order to demonstrate that a debtor has made its best effort to repay creditors, it is certainly appropriate to examine both the use of the debtor's resources during the administration of a Chapter 11 case and the debtor's projected use of those resources after confirmation of the debtor's plan."); In re Bennett, 2008 Bankr. LEXIS 1354, at *7 (Bankr. E.D. Va. Apr. 23, 2008) (noting that "even if a plan satisfies the liquidation test, it would not satisfy the good faith requirement if the debtor had the ability to pay a greater dividend"). The ability to pay factor is not a mirror image of § 1129(a)(15), which potentially requires the commitment of all disposable income to an unsecured creditor in applicable cases. Instead, when construing this element of the good faith requirement of § 1129(a)(3), courts assess whether a debtor can commit more than proposed under his particular plan, based on his total financial scenario.[6] The ability to pay factor is viewed through a wide lens, such that the amount of disposable income committed is but one of many ways to balance the existence of extensive resources with the objective of making a good faith effort to repay creditors.

---

[6] Although the majority of the cases cited above were decided prior to the addition of § 1129(a)(15) to the Bankruptcy Code as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, the court has no reason to question their continued applicability. In fact, the Bennett case was decided in 2008, post-BAPCPA.

In this case, the debtors have over $500,000 in unsecured debt, consisting primarily of tax debt owed to the IRS (the debtors owe priority tax debt of $110,484.55 to the IRS and $1,569.00 to the NCDOR). Yet the debtors only propose to pay $20,000 to the unsecured class. The court finds that based on the debtors' massive $140,000 "war chest," extremely high income, retention of substantial assets, and their spending habits, a proposed distribution of $20,000 over the course of five years is not indicative of a good faith desire to repay creditors. Instead, it is somewhat like tossing the unsecured creditors a bit of spare change. This is especially so, given that the debtors have a colossal resource to draw from in the repayment of creditors: they have $140,000 accumulated in their bank accounts. Although the male debtor testified both that this is a "rainy day fund" and that he intends to use $50,000 to pay his 2012 tax obligations upon confirmation, this payment is not provided for in the plan, and even if made, the debtors will still have approximately $90,000 in cash on hand.

In light of the debtors' projected post-petition expenses vs. their recent actual expenses (as discussed further below), the court recognizes the need for a rainy day fund. The problem is that the plan allows the debtors to retain it all and pay none of it to unsecured creditors if the rainy day, i.e., a month with low earnings, does not come. Thus, it serves as an incentive for the debtors to live above their means because they can tap into the fund for luxuries. The debtors have not proposed to place a limitation on the rainy day fund; for example, by providing that the fund may <u>only</u> be tapped for expenses set out in the debtors' budget. Nor have they proposed a way for using the fund for unsecured creditors if income levels remain high during the plan period, i.e., should the debtors' income during the first year post-confirmation be at least equal to their projected income, the plan could require payment of 20% of the $140,000 (or the $90,000 if a $50,000 lump sum payment is

made to priority tax claims) to unsecured creditors, over and above the regular distribution, and so on for the remaining years of the plan duration.

In addition, the debtors have two homes. If one of which were liquidated, the debtors would receive cash from the realization of equity, but at a minimum the resulting reduction in the debtors' expenses would provide thousands of dollars per month to devote to the repayment of creditors. This is especially so with regard to the Bald Head Island Property, with monthly expenses of $3,758 and rental income of $1,583 per month, at best. Holding real estate with negative cash flow is an indicator of bad faith. See Crestar Bank v. Walker (In re Walker), 165 B.R. 994, 1001 (E.D. Va. 1994) (finding a lack of good faith and impermissible use of chapter 11 where the debtors' plan proposed to liquidate certain properties at certain minimum sale prices on an open-ended timeline, essentially allowing the debtors to ride out the real estate market in hopes of avoiding a loss on the liquidation of their assets). Additionally, the debtors could pay more to unsecured creditors with a simple reduction in spending. As discussed more fully below, the debtors spend exorbitant amounts of money on food and clothing. A reduction in these expenditures is yet another way to make a more meaningful distribution to unsecured creditors.[7]

---

[7] Even where a debtor proposes to pay unsecured creditors in full with interest, a plan may be proposed in bad faith if it appears its goal was to maintain an affluent lifestyle at the expense of creditors. In the Walker case cited above, the debtors' plan proposed to pay unsecured creditors in full upon the sale of certain property on an open-ended timeline, while allowing the debtors to retain a 3,500 square foot waterfront home in which they had substantial equity, nine show horses valued at $500,000, an antique car collection valued at $150,000, notes receivable valued at $1.2 million, a partnership interest valued at $729,000, and investment income. Crestar Bank v. Walker (In re Walker), 165 B.R. 994, 1001 (E.D. Va. 1994). Among other things, the court found that the plan did not adequately commit the full range of the debtors' resources to repay creditors, and instead allowed the debtors to use chapter 11 as a means to continue pursuit of a "very enjoyable" lifestyle while riding out the real estate market.

The bankruptcy administrator further contends that the debtors' expenses are excessive and largely unnecessary, such that the plan has been proposed solely for the debtors' benefit rather than in a good faith attempt to repay creditors. Courts have frequently considered lifestyle choices such as excessive expenditures to be an important factor in the good faith analysis. As stated by the Honorable A. Thomas Small, if a high income debtor's plan provides for the use of such income "to make heavy mortgage payments on a lavish house, to pay for luxury cars, and to generally support an extravagant lifestyle, the plan may not meet the confirmation requirements of 11 U.S.C. § 1129(a)." In re Fernandez, 97 B.R. 262, 263 (Bankr. E.D.N.C. Mar. 9, 1989).

In fact, a number of courts have denied confirmation either solely or significantly based on a finding that extravagant lifestyle choices constituted bad faith; many of these cases involved facts quite similar to those of the present case. See, e.g., In re Kemp, 134 B.R. 413, 416 (Bankr. E.D. Cal. 1991) (holding, where the debtor had available net income of $180,000 per year but only proposed to pay $48,000 per year toward a $300,000 judgment debt, that the debtor was capable of making substantially higher payments than those offered in the plan); In re Harman, 141 B.R. 878 (Bankr. E.D. Pa. 1992) (male debtor had income of at least $400,000 per year, the debtors maintained two homes with mortgage payments totaling $11,000, and although the wife stayed home with the children, the debtors had significant expenditures on childcare, laundry, and maid service); In re Weber, 209 B.R. 793 (Bankr. D. Mass. 1997) (debtors maintained two homes including a vacation home with annual expenses of $21,300, traveled extensively, budgeted $1,012/month for newspapers, recreation and entertainment including a golf club membership, and budgeted $782/month for professional association meetings/continued education).

Turning to the spending habits of the debtors in the present case, it is apparent from a review of the debtors' monthly reports that the debtors engage in significant spending in numerous areas. Starting with food-related expenses, the male debtor testified that he does in fact spend a significant amount of money on food, explaining that he entertains clients as much as possible in order to develop business. This entertaining generally entails dinners, often at upscale restaurants, on average two to three times a week. Although it is not possible to determine whether the debtors are dining for business or pleasure based on the bank statements attached to the monthly reports, it appears that for the month of October, 2012, the debtors spent approximately $1,020 on dining out. Groceries for that month were an additional $850, resulting in a total expenditure of $1,870 on food for the month of October, 2012. This is far in excess of the debtors' projected expense of $700/month for food. Moreover, according to the monthly report for January, 2013, the debtors spent approximately $1,801 on dining out plus $994 on groceries, for a total of $2,795 spent on food in one month.

The court finds that the debtors' expenditures on food and dining are excessive, even while recognizing that a certain amount of client entertaining may be beneficial to generating and maintaining business in the male debtor's line of work. In this case, it appears that the extent of such entertaining is excessive, considering that in the two months examined, the debtors spent $1,020 and $1,801on dining out. In contrast, the debtors' grocery expenses of $850 and $994, respectively, while slightly more than their $700 postconfirmation budget for food, appear reasonable to the court for the debtors' family size. When the grocery and restaurant expenses are combined, however, the thought of food-related expenditures of $1,870 and $2,795 in two different months is a bit staggering. Even more staggering is the fact that of the $1,801 spent in January, 2013 on dining out, approximately $828.69 was spent on restaurant dining on Bald Head Island, yet the testimony did

14

not indicate that any client entertaining is done on Bald Head Island, as it appears that the male debtor sells real estate in the Raleigh area only at present. This can only lead to the conclusion that during those trips to Bald Head, which the male debtor testified were almost strictly for maintenance, the debtors entertained themselves, to an extensive degree.

In addition, the monthly reports reveal significant spending on clothing. For the month of October, 2012, the debtors spent $1,460 at clothing stores and boutiques. When asked how the debtors would manage on their postconfirmation budget of $100/month for clothing, the male debtor stated that they are reducing expenses as much as possible, even clipping coupons. However, in January, 2013, the debtors' total clothing expenditure, although reduced, still totaled $1,048. The male debtor further testified that at least for the month of January, 2013, the clothing expenses were incurred for a business purpose. While this may certainly be the case, the court notes that the vast majority of the $1,460 in clothing expenditures in October of 2012 occurred at women's boutiques.

The court finds that the debtors clearly have excessive expenditures on clothing. Again, the court recognizes that individuals in certain lines of work may benefit from presenting a professional image and wearing nice clothing. However, it is excessive for a chapter 11 debtor to spend $1,000 in a month on clothing, when there are plenty of readily available, affordable options for professional attire. Furthermore, it is borderline astounding that over $1,400 was spent in at least one month at primarily women's boutiques during the pendency of a chapter 11 case. Without any attempted explanation for such purchases, the court can only presume the female debtor far exceeded the realm of necessity in her clothing purchases that month.

As to travel-related expenditures, the debtors' October, 2012 bank statement contains two purchases totaling $4,269 on "Disney Resort." In addition, the February statement shows total

charges of $477.38 for "The Umstead Hotel," which is a local luxury hotel. Again, these numbers are not even close to the debtors' projected postconfirmation budget, which allocates only $100 to recreation and entertainment. And once again, the court considers the debtors' expenses in the area of travel to be excessive. Perhaps some compelling reasons existed for taking a $4,269 trip to Disney, but none were offered, leaving the court to assume the trip was taken for pure recreation. Likewise, no explanation was provided regarding the $477.38 night spent at a local luxury hotel. While the court certainly would not discourage recreation, this is yet another area in which the debtors' spending is over the top, rather than reduced, in contradiction of the testimony.

Finally, the male debtor testified that his family has utilized the Bald Head Island Property very few times recently, and that their visits are almost entirely for the purpose of maintenance and preparation for rental. The bank statements attached to the debtors' monthly reports, however, beg to differ. In January of 2013, visits appear to have been made at least two times, during which expenses were incurred at restaurants, the local market, the hardware store, the ferry and parking lot, as well as a few miscellaneous expenses on the island for a total of $1,377. Of that $1,377 spent on the trips, at least $828.69 was spent on dining out, and only $153 appears to be related to maintenance.

As to housing, the debtors maintain two homes with combined mortgage payments of $6,354.72, plus expenses of $1,008.30 in connection with the Raleigh Property, and expenses of $1,245.00 for the Bald Head Island Property, for total monthly expenditures of $8,602.02 on housing. Taken with the debtors' other significant expenses, this is beyond excessive, especially considering that the Bald Head Island Property only produces $1,583 per month in rental income, and is either sitting vacant or being used by the debtors as a vacation home during the non-summer

months, which equates to approximately 42 weeks per year. The male debtor testified that selling either property would not benefit anyone, considering that they are underwater on the Raleigh Property and might only break even on the Bald Head Island Property. Further testimony indicated that the Raleigh Property had been listed for sale years ago for $819,000, and the Bald Head Island Property was "reluctantly" listed for $700,000, yet no offers (or lesser offers) were received and the properties were taken off the market. According to the testimony, the debtors have never listed the properties for less than these amounts, even though the mortgage on each property is significantly less.

Although the debtors appear to own at least one vehicle outright (the Mountaineer), their monthly payment on the Lexus is $694.[8] The court notes that some families might choose a lower priced vehicle when faced with the same financial situation. As to education, the debtors pay $1,400 per month for their 12 year old's private schooling. Education of one's children is an extremely personal issue, and one the court will not second guess. However, the debtors' vehicular and educational expenses are considered in the totality of the circumstances analysis.

In light of the debtors' high cost lifestyle, the court cannot conclude that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code. Instead, the plan fails to meet the § 1129(a)(3) requirement of proposal in good faith. The debtors contend that the objectives and purposes of the Code should be viewed as requiring transparency and honesty of debtors, as well as following the Code's payment hierarchy and preferences, and that the debtors here

---

[8] In addition, the male debtor testified that both the Mountaineer and the Lexus have high mileage, warranting large expenditures on repairs in recent months.

have sufficiently achieved these objectives and purposes. However, the court must view the totality of the circumstances in construing the good faith requirement of § 1129(a)(3).

In this case, the male debtor has reached a level of income that many people will never attain, even in dual income households. At the same time, the debtors maintain significant financial obligations, including a spacious primary home and exclusive vacation home, as well as a luxury vehicle and private schooling for their son. And, as clearly shown in the monthly reports and testimony, the debtors spend significant amounts of money on food, clothing, and recreation. A plan that allows the debtors to maintain such a high cost lifestyle, while paying only $20,000 to unsecured creditors and retaining $140,000 in the bank, certainly cannot be consistent with the purposes and objectives of the Bankruptcy Code. While the Code confers many benefits to debtors, continued maintenance of an extravagant lifestyle surely was not intended to be one of them.

Additionally, the notion of a debtor receiving the privilege of a chapter 11 discharge, while making meager repayment to creditors and enjoying what many would view as a "privileged" lifestyle, is likely to offend the integrity of the bankruptcy system and send the wrong message to the public. See Weber, 209 B.R. at 800. In the Weber case, in which the debtors maintained two homes, traveled extensively, and incurred extravagant expenses, the court held that "[t]he message that this Debtor's Plan and conduct send is that an individual may file a Chapter 11 petition and continue to live in luxury while paying a relative pittance to creditors. The purpose of the Bankruptcy Code is to provide the debtor with a fresh start, not to preserve a debtor's extravagant lifestyle." Id. Similarly, in the Belco Vending case, which contained some striking similarities to the present case, the court noted the importance of the public perception of the outcome of particular bankruptcy proceedings:

> Where there is no objecting creditor, secured or unsecured, (apparently, the unsecured get at least 10 percent in cash . . . ), what should be the Court's role, if any, when the plan may turn out to be feasible but the individual presents a public perception of having beaten the system? Why, when discharge is a matter of privilege, not right, *U.S. v. Kras, 409 U.S. 434, 93 S. Ct. 631, 34 L. Ed. 2d 626 (1973),* should the debtor be allowed the luxury of the creature comforts of continued mansion life style while creditors are not paid in full and the fragile public acceptance of the fairness of the bankruptcy law takes another beating? Fresh start is a cornerstone of enlightened bankruptcy, but did Congress intend to allow the bankrupt to emerge looking like the 'en grand seigneur'?

In re Belco Vending, Inc., 67 B.R. 234, 239 (D. Mass. 1986). This court thinks not.

Having determined that the good faith requirement of § 1129(a)(3) is not satisfied, the court must deny confirmation. At the same time, the court sees numerous opportunities for changes that may enable the debtors to propose a plan that would fulfill the good faith requirement. As such, the debtors will have the opportunity to file an amended plan. The court notes, however, that feasibility may come into question if adequate changes are not made to the debtors' budget. But for the $140,000 war chest, confirmation of the current plan may well have been denied based on feasibility grounds, given that the debtors' spending over the last several months far exceeds their budget in at least the categories of food, clothing, and recreation.

Accordingly, confirmation of the debtors' plan of reorganization is **DENIED.** The debtors may file an amended plan within 20 days of this order.

**SO ORDERED**.

**END OF DOCUMENT**